UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **BRENDA SIMPSON,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil No. 2:13-cv-00087 |
| ) | Judge Sharp/Brown |
| **WHITE COUNTY, TENNESSEE,** ) | |
| *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM**

Plaintiffs Brenda and John Simpson filed suit against White County, Tennessee; Oddie Shoupe, Sheriff of White County ("Sheriff Shoupe"); and John Meadows ("Officer Meadows"), an employee of the White County Sheriff's Office (collectively "Defendants"). Pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 44), to which Plaintiffs have responded in opposition (Docket No. 50), and Defendants have replied (Docket No. 53). For the reasons set forth below, the Motion for Summary Judgment will be granted in part and denied in part.

**I. Factual & Procedural Background**[1]

Plaintiff Brenda Simpson ("Mrs. Simpson") visited the White County Justice Center ("Justice Center"), where her son Kyle was incarcerated, on September 23, 2012. She visited intending to determine whether her other son, Cameron, had recently visited Kyle so that she could discuss Kyle's wellbeing with Cameron. Plaintiff did not schedule a visit with Kyle because her goal was not to see him but to learn about who had previously visited him. Mrs.

---

[1] Unless otherwise noted, the following facts are drawn from Defendants' Statement of Undisputed Facts (Docket No. 46), Plaintiffs' response thereto (Docket No. 52), and the audio recording from Officer Meadows (Docket No. 43).

1

Simpson arrived at the Justice Center between 1:30 and 3:00 pm on the afternoon of the 23rd. As she headed toward the entrance, she heard what she believed to be a kerfuffle on the recreation yard: inmates yelling, cursing, and threatening each other. Mrs. Simpson recalls hearing her son's voice among those on the recreation yard, although she does not recall him sounding distressed. Still, Mrs. Simpson became worried for her son's safety and sought to discuss this—in addition to her son's previous visitors—with someone at the Justice Center.

Mrs. Simpson then entered the Justice Center, where she heard a female employee, now known to be Officer Lewis, speaking with someone else who wanted to visit an inmate.[2] That person did not have a scheduled visit but Officer Lewis let the person in for a visit anyway. Based on her concerns about her son's safety, Ms. Simpson inquired about making an unscheduled visit to Kyle and became upset when she was not granted access to her son. Mrs. Simpson then began recording her interactions with Officer Lewis on her cell phone video camera. Eventually, Officer Lewis left the Justice Center's front desk to explain the situation to Sergeant Julie Rizor, who Officer Lewis hoped would speak with Mrs. Simpson.

While Officer Lewis was away from the front desk, Mrs. Simpson picked up a phone and called the Justice Center to request help. More importantly, immediately after dialing the Justice Center, Mrs. Simpson used a pay phone in the front office area to dial 911, the emergency telephone line. A transcript of the 911 call reveals the following exchange:

> *Dispatcher*: 911, what is your emergency?
> *Mrs. Simpson*: Uhhh, connect me to the Justice Center.
> *Dispatcher*: Let me give you that phone number, okay?
> *Mrs. Simpson*: I've got it, just connect me to the Justice Center.
> *Dispatcher*: I can't connect you to the Justice Center.
> *Mrs. Simpson*: Okay, thank you for your time. Thank you so much.
> *Dispatcher*: Okay.

---

[2] The Court cannot locate Officer Lewis's first name in any of the filings.

The director of the White County E-911, Greg England, noticed that the call came from the Justice Center and, finding this strange, called back. Mrs. Simpson answered Mr. England's return call and confirmed that she had been the one to dial 911.[3] Mr. England found his exchange with Mrs. Simpson odd enough that he dispatched an officer to the Justice Center to speak with her. Meanwhile, after speaking with Officer Lewis, Sergeant Rizor went to the front desk to speak with Mrs. Simpson. Mrs. Simpson again expressed concern about the supervision of inmates on the recreation yard. Sergeant Rizor informed Mrs. Simpson that there was someone monitoring the inmates in the recreational yard.

Officer Meadows, who was dispatched to the Justice Center in response to Mrs. Simpson's 911 call, soon arrived. He was aware upon dispatch that someone had dialed 911 from the Justice Center lobby, possibly for nonemergency reasons. When Officer Meadows arrived at the Justice Center, Sergeant Rizor recounted her conversations with Mrs. Simpson. An audio recording captures the parties' interactions from this point forward. Officer Meadows asked Mrs. Simpson why she called 911, to which she replied "[b]ecause I wanted to." She later reiterated that the reason she called was because she wanted to. Mrs. Simpson asked Officer Meadows if she broke the law by dialing 911, saying "[c]an you not call 911 anytime you want to?" When Officer Meadows confirmed that 911 cannot be called except for in emergency situations, Mrs. Simpson followed up by asking whether one is allowed to call 311 anytime. This portion of the exchange indicates that Mrs. Simpson did not know that the law does not permit calling 911 for non-emergent reasons. The exchange between Officer Meadows and Mrs. Simpson included some barbs, with Mrs. Simpson asking Officer Meadows for the "Webster's

---

[3] Mrs. Simpson has admitted at least this portion of the phone call with Mr. England but also, curiously, has denied having any recollection of speaking to Mr. England.

3

Dictionary" definition of an emergency. Mrs. Simpson has admitted to the fact that she behaved argumentatively toward Officer Meadows.

Ultimately, this argumentativeness gave way to Officer Meadows deciding to arrest Mrs. Simpson for her misuse of the emergency telephone line. When Officer Meadows stated that he planned to arrest Mrs. Simpson, she responded, "[y]ou don't want to arrest me." Officer Meadows, however, moved forward with the arrest: less than eight seconds after initiating arrest, Officer Meadows threatened to use his taser on her. He also swept Mrs. Simpson to the floor and put one of her arms in handcuffs. Mrs. Simpson has stated that Officer Meadows could not handcuff her other arm because she had her cell phone in that hand, which she was pinned on top of. Officer Meadows asked her several times to put her hands behind her back and to roll over, to which Mrs. Simpson responded, "I will." Mrs. Simpson then became agitated, shrieking "[y]ou've got to let me take a deep breath" and "[y]ou're hurting my wrist." Just over a minute after initiating the arrest and when Mrs. Simpson was already pinned on the ground, unable to flee, Officer Meadows can be heard using his taser on her.

Officer Meadows then reiterated his demand that Mrs. Simpson put her hands behind her back and threatened to tase her again. Mrs. Simpson responded repeatedly "I will," while sounding terrified by the ordeal. When Mrs. Simpson still did not put her other arm behind her back, Officer Meadows tased her again, this time for almost seven seconds. Officer Meadows then again told Mrs. Simpson to put her arm behind her back, to which she responded, "[h]ow can I? You're holding me." Less than ten seconds after the second tasing, Officer Meadows tased Mrs. Simpson a third time. It bears repeating that Officer Meadows's use of the taser occurred after Mrs. Simpson was on the ground with at least one arm in handcuffs. Soon

thereafter, Officer Meadows put Mrs. Simpson's second arm in handcuffs and backup officers and emergency services arrived to provide assistance.

Officer Meadows's use of his taser has given rise to the instant litigation. Plaintiffs filed suit in September 2013 bringing claims under both federal and state law. More specifically, the Complaint asserts that Officer Meadows's conduct violated Plaintiffs' Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 ("Section 1983"). The Complaint also includes the state law tort claims of assault, battery, negligence, and negligent and intentional infliction of emotional distress. Plaintiffs seek to have Sheriff Shoupe and White County held liable for the conduct of Officer Meadows. Mr. Simpson has also alleged loss of consortium.

Defendants seek summary judgment on all claims, arguing that they are entitled to immunity. In responding to Defendants' Motion for Summary Judgment, Plaintiffs have conceded that summary judgment is appropriate on the following: claims for failure to intervene; claims against Sheriff Shoupe; Section 1983 municipal liability claims against White County; and Mr. Simpson's "familiar association" claims. The remaining claims now before the Court are Mrs. Simpson's excessive force claim against Officer Meadows; Mrs. Simpson's state law tort claims against Officer Meadows and White County; and Mr. Simpson's claim for loss of consortium. (Docket No. 50 at 3).

## II. Legal Analysis

A. The Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 375

(6th Cir. 2002). The Court must view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party, here Plaintiffs. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B. Mrs. Simpson's Excessive Force Claim & Qualified Immunity

Mrs. Simpson alleges that Officer Meadows's use of his taser violated her right to be free from excessive force under the Fourth Amendment. Officer Meadows argues that he is entitled to qualified immunity, and therefore summary judgment, on this claim. The Court disagrees.

Qualified immunity shields public officials from liability for civil damages unless a plaintiff is able to establish: (1) the facts show a violation of a constitutional right, and (2) the right at issue was "clearly established" when the event occurred such that a reasonable officer would have known that his conduct violated the plaintiff's constitutional right. Pearson v. Callahan, 555 U.S. 223, 232 (2009). In the summary judgment posture, the case must go to the jury if the court finds that "first, there are genuine issues of material fact as to whether [the Officers] violated [the plaintiff's] Fourth Amendment rights in an objectively unreasonable way and, second, those rights were clearly established at the time of [the plaintiff's] arrest such that a reasonable officer would have known that his conduct violated them." St. John v. Hickey, 411 F.3d 762, 768 (6th Cir. 2005). These questions may be answered in either order; if either one is answered in the negative, then qualified immunity protects the officer from civil damages. Martin v. City of Broadview Heights, 712 F.3d 951, 957 (6th Cir. 2013) (citing Pearson, 555 U.S. at 236). Here, because the Court answers both questions in the affirmative, qualified immunity does not apply.

*1. Whether a Constitutional Violation Occurred*

Whether an officer's use of force in effecting an arrest violates the Fourth Amendment turns on "whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). Three important but non-exhaustive factors guide this analysis: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Shreve v. Jessamine Cnty. Fiscal Ct., 453 F.3d 681, 687 (6th Cir. 2006). (citing Graham, 490 U.S. at 396). The ultimate question, however, is "'whether the totality of the circumstances justifies a particular sort of seizure.'" St. John v. Hickey, 411 F.3d 762, 768 (6th Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).

Throughout the inquiry, the Court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. The Court considers "'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" Goodwin v City of Painesville, 781 F.3d 314, 321 (6th Cir. 2015) (quoting Graham, 490 U.S. at 396), and must take into account the fact that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. With this in mind, the Court considers the reasonableness of Officer Meadows's use of his taser on Mrs. Simpson.

The first Graham factor, the severity of the crime, weighs in Plaintiffs' favor. Defendants initiated Mrs. Simpson's arrest based on a potential Class C misdemeanor, misuse of an

emergency line, which is neither a serious nor a violent offense. As such, this factor weighs in favor us using less force. The second Graham factor, whether Mrs. Simpson posed an immediate safety threat, also weighs in favor of less force. Ms. Smith arrived at the Justice Center of her own accord to find out whether her son had received visitors. Mrs. Simpson came unarmed and nothing she said or did seems to have caused Officer Meadows to believe she was armed. She did not react violently or try to use physical force against the officers. Mrs. Simpson did not make any threats to the safety of herself or others. At most, the officers might have interpreted Mrs. Simpson's remark, "you do not want to arrest me," as vaguely threatening. Even if this statement is construed as a threat, nothing else supports the conclusion that Mrs. Simpson would have harmed herself or others. Although the facts on the record make clear that Mrs. Simpson did not cooperate with Officer Meadows, as discussed more in the following paragraph, a reasonable jury could conclude that her resistance did not pose any danger to Officer Meadows or anyone else.

The third Graham factor, whether the suspect is resisting arrest, entails a slightly more in-depth analysis, which hinges on whether Mrs. Simpson's conduct constitutes passive or active resistance. Active resistance to an officer's command can legitimize an officer's use of a Taser. Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012). The Sixth Circuit has said that "noncompliance alone does not indicate active resistance; *there must be something more*. It can be a verbal showing of hostility, as was the case in Caie. It can also be a deliberate act of defiance using one's own body, as in Hagans, or some other mechanism, such as the truck in Foos." Eldridge v. City of Warren, 533 F. App'x 529, 535 (6th Cir. 2013) (emphasis added) (citations omitted).

Mrs. Simpson may not have complied with Officer Meadows's requests that she put both her hands behind her back, but her conduct falls short of active resistance. When asked to put her arm behind her back Mrs. Simpson repeatedly said "I will," even if she did not immediately do so. Sergeant Rizor also confirmed in her deposition that that she was unable to get Mrs. Simpson's free arm in handcuffs because that arm was pinned beneath Mrs. Simpson, who had been taken to the ground by Officer Meadows. (Docket No. 50-4 at 3). Mrs. Simpson was not attempting to scramble up and run away, nor was she trying to fight Officer Meadows. She also said that she was in pain and asked for a minute to catch her breath. Her so-called resistance appears to be attributable to panic, not combativeness.[4]

The Court therefore reaches the same conclusion as the Sixth Circuit did in Eldridge and finds that, "[w]hen the totality of the circumstances is considered, it is clear that the interaction at issue here does not follow the typical course of active resistance." 533 F. App'x at 535 (citing Lawrence v. Bloomfield Twp., 313 Fed. App'x. 743 (6th Cir. 2008)). This was not a case "where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying (and often requiring) the use of force," id., but rather is an instance of a suspect panicking when threatened with arrest and tasing after minor infraction. Put another way, Mrs. Simpson's conduct "does not resemble the physical and immediate safety threat [the Sixth Circuit] ha[s] found in other cases to justify tasing." Kent v. Oakland Cnty., No. 14-2519, 2016 WL 66566, at *4 (6th Cir. Jan. 6, 2016) (collecting cases). A distinction lies in the space between imperfect cooperation and the type of active resistance that warrants the use of force. Here, that distinction separates reasonableness from unreasonableness.

---

[4] Mrs. Simpson's "admission" at her deposition that she was actively resisting arrest does change this conclusion. Whether a suspect was actively resisting arrest is a question of fact, not word choice.

9

Considering all of the facts and circumstances, the Court finds answers the first step of the qualified immunity inquiry in the affirmative: a jury could conclude that Officer Meadows's use of the taser was objectively unreasonable in violation of the Fourth Amendment. Accordingly, the Court turns to the second step of the qualified immunity analysis.

2. *Whether the Right Was Clearly Established*

The second question in the qualified immunity analysis requires the Court to ask whether it was clearly established in September 2012 that Mrs. Simpson had a right not to be tased under these circumstances. The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Stanton v. Sims, ––– U.S. ––––, ––––, 134 S. Ct. 3, 5 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, –––, 131 S. Ct. 2074, 2085 (2011)). "An officer violates clearly established law and loses that immunity when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Kent, 2016 WL 66566 at *8 (citations and internal quotation marks omitted). A plaintiff need not present a case "directly on point" in order to prove that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." Stanton, 134 S. Ct. at 5 (quoting al-Kidd, 131 S. Ct. at 2083). The law is clearly established when the plaintiff can point either to "cases of controlling authority in his jurisdiction at the time of the incident," or to "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." Wilson v. Layne, 526 U.S. 603, 617 (1999).

When considering whether a right is clearly established, the Court must not define the right at too high a level of generality. See Hagans, 695 F.3d at 508 (citing al-Kidd, 131 S.Ct. at

2084). Still, "just as a court can generalize too much, it can generalize too little." Id. The Court must therefore strike an appropriate "middle ground." Id. Defined at an appropriately particularized level of generality, the inquiry here is whether it was clearly established in September 2012 that the Fourth Amendment prohibits repeatedly tasing a nonviolent misdemeanant who did not immediately cooperate with a request to be handcuffed when she was already pinned to the ground and verbalizing her intent to submit to arrest.

In 2008, the Sixth Circuit clearly stated that "the gratuitous or excessive use of a taser" violates a clearly established constitutional right. Landis v. Baker, 297 Fed. App'x. 453, 463 (6th Cir. 2008). Since at least August 2012, one month before the incident at issue here, the Sixth Circuit has pointed to active resistance versus passive resistance as the dividing line between reasonable and unreasonable use of force when making arrests. Hagans, 695 F.3d at 509 (collecting cases). A survey of Sixth Circuit case law also indicates that even before Hagans the Sixth Circuit had already clarified that where an officer already has physical control over a suspect, as here, there is a clearly established right to be free from repeated or prolonged tasing. Kent, 2016 WL 66566 at 8-9 (gathering Sixth Circuit cases on suspects who have been physically subdued). Based on this precedent, the Court finds that Mrs. Simpson's rights were sufficiently clear at the time that Officer Meadows subjected her to repeated tasing.

Because a reasonable jury could find that Officer Meadows's conduct violated Mrs. Simpson's clearly established constitutional rights, the Court declines to grant Defendants' request for summary judgment on Mrs. Simpson's excessive force claim against Officer Meadows.

C. Mrs. Simpson's State Law Tort Claims

Defendants also seek summary judgment on Mrs. Simpson's claims for assault, battery, negligence, and intentional and negligent infliction of emotional distress. Defendants argue that they are immune from Mrs. Simpson's state tort claims pursuant to the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-201, *et seq.* ("TGTLA") and that Officer Meadows is entitled to qualified immunity.[5]

The Court finds that White County is entitled to immunity under the TGTLA on those of Plaintiffs' state tort claims which are premised on negligence. "The TGTLA removes immunity for 'injury proximately caused by a negligent act or omission of any employee within the scope of his employment,' but provides a list of exceptions to this removal of immunity." Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010) (quoting Tenn. Code Ann. § 29-20-205). "Injuries that arise out of . . . civil rights claims are one such exception, that is, sovereign immunity continues to apply in those circumstances." Id. (internal quotation marks and citation omitted). Tennessee courts construe the phrase "civil rights" to include claims arising under Section 1983 and the United States Constitution. Id. A "negligence claim falls within this exception where 'the same circumstances giv[e] rise to both the negligence and civil rights claims.'" Partee v. City of Memphis, 449 F. App'x 444, 448 (6th Cir. 2011) (citing Johnson, 617 F.3d at 872). Here, the circumstances which gave rise to Mrs. Simpson's civil rights claims also gave rise to her negligence and negligent infliction of emotional distress claims. Accordingly, the TGTLA shields White County from those claims and the Court will grant summary judgment on those of Mrs. Simpson's claims against the County that sound in negligence.

---

[5] As noted above, Plaintiffs no longer seek to hold White County liable under Section 1983. Plaintiffs do, however, oppose summary judgment on the state tort claims against White County.

The same cannot be said of Mrs. Simpson's intentional tort claims, which survive due to the interplay between the TGTLA and another state statutory provision, Tenn. Code Ann. § 8-8-302. That section provides:

> Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Courts have construed this statutory provision to apply, not the TGTLA, when an action is based on a deputy's misconduct, rather than his or her negligence. See Margeson v. White Cty., Tenn., No. 2:12-cv-00052, 2013 WL 6712843, at *11 (M.D. Tenn. Dec. 18, 2013), aff'd in part, 579 F. App'x 466 (6th Cir. 2014). Accordingly, a plaintiff may "recover from a governmental entity for the intentional misconduct of a deputy under this statute" if "'the misconduct occurred while the deputy was acting by virtue of or under color of his office.'" Currie v. Haywood Cnty., 2011 WL 826805 at *3 (Tenn. Ct. App. Mar. 10, 2011) (citation omitted).

Mrs. Simpson's claims for assault, battery, and intentional infliction of emotional distress stem from Officer Meadows's alleged misconduct, not negligence. Defendants do not argue that Officer Meadows was not acting under color of White County when he repeatedly tased Mrs. Simpson. Section 8-8-302 therefore applies to Mrs. Simpson's non-negligence tort claims and exposes White County to liability.

As noted above, qualified immunity does not protect Officer Meadows from Mrs. Simpson's excessive force claim. Qualified immunity is likewise inapplicable to Mrs. Simpson's state law tort claims. See Griffin v. Hardrick, 604 F.3d 949, 956 (6th Cir. 2010) (citation omitted) ("'[W]hether the analysis concerns whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns

whether an officer committed state-law battery by using force that was 'clearly excessive,' the same principles . . . are applied.'"). Mrs. Simpson's tort claims against Officer Meadows therefore survive summary judgment.

D. <u>Mr. Simpson's Loss of Consortium Claim</u>

Although Plaintiffs have dismissed all of Mr. Simpson's "familiar association" claims, he also asserted a separate claim for loss of consortium. Loss of consortium is a derivative claim. <u>Hunley v. Silver Furniture Mfg. Co.</u>, 38 S.W.3d 555, 557 (Tenn. 2001). Mr. Simpson's claim would therefore originate from Mrs. Simpson's claim for violation of her Fourth Amendment rights. <u>Id.</u> However, "[o]ne person may not sue for the deprivation of another person's civil rights." <u>Pierce v. Stinson</u>, 493 F. Supp. 609, 611 (E.D. Tenn. 1979) (citing <u>Hall v. Wooten</u>, 506 F.2d 564, 566 (6th Cir. 1974)). This means that spouses cannot state a claim for loss of consortium that derives from a violation of another's civil rights. <u>See</u> <u>Powers v. Wallen</u>, No. 3:12-CV-96, 2013 WL 1327135, at *10 (E.D. Tenn. Mar. 29, 2013) (collecting cases in the Sixth Circuit that disallow loss of consortium claims based on a spouse's Section 193 claim). Defendants are therefore entitled to summary judgment on Mr. Simpson's loss of consortium claim.

### III. <u>Conclusion</u>

Officer Meadows is not entitled to qualified immunity. The Court will therefore deny summary judgment on Mrs. Simpson's excessive force and state law tort claims against him. Neither does state law protect White County from Mrs. Simpson's state claims for intentional torts. However, the TGTLA does shield White County from Mrs. Simpson's negligence claims and the Court will grant summary judgment as to those. Additionally, Defendants are entitled to summary judgment on Mr. Simpson's loss of consortium claim. The only remaining claims are

14

Mrs. Simpson's excessive force claim against Officer Meadows; Mrs. Simpson's state law claims against Officer Meadows; and Mrs. Simpson's intentional tort claims against White County. An order consistent with this opinion will be entered.

    It is SO ORDERED.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE